TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN







NO. 03-03-00350-CV






Jack Weatherford, Appellant


v.


The City of San Marcos, Texas; David Chiu; Jane Hughson; Louis Doiron, Jr.; Earl
Moseley, Jr.; Joe B. Cox, Jr.; Paul Mayhew; and Martha Castex Tatum, Appellees







FROM THE DISTRICT COURT OF HAYS COUNTY, 22ND JUDICIAL DISTRICT

NO. 2001-0406, HONORABLE WILLIAM E. BENDER JUDGE PRESIDING





O P I N I O N




 In this cause, we are confronted with a dispute between a property owner, his
neighbors, and a city over the property owner's attempts to develop his property for commercial
purposes. The property owner, Jack Weatherford, his neighbors, and the City of San Marcos met,
negotiated, and agreed in principle that some commercial development of Weatherford's property
was possible. Weatherford's subsequent rezoning requests, however, were denied. He sued the City
of San Marcos and the City Council (collectively, the "City"), claiming their denials violated his
rights to due process and equal protection, violated chapter 245 of the government code, constituted
a regulatory taking, and were proprietary in nature and thus subject to estoppel. The City moved for
summary judgment arguing that the negotiated land-use plan established only the basic framework
for future development and did not formally vest in Weatherford the right to develop his property
commercially. The district court granted summary judgment for the City, and we affirm.


Procedural and Factual Background


 Weatherford owns about fifty acres in the City of San Marcos. He bought a large tract
in the early 1960s, and two smaller tracts in about 1981 and 1995. When Weatherford bought the
first tract of land, the property was not within the City's boundaries and was not subject to zoning. 
The property was annexed and brought into the City in the early 1970s, and since being annexed has
always been zoned for single-family residential use. The property adjoins and is surrounded by other
single-family tracts, and nearby subdivisions are low-density developments. For the past several
years, Weatherford has sought on numerous occasions to have portions of his property rezoned to
allow for the development of multi-family residential and commercial projects. His neighbors have
consistently opposed these efforts. During this time, the City was in the process of updating its
comprehensive land-use plan. (1) The updates set out guidelines for the future development of all
property located in the City, which was divided into eight sectors. Weatherford's property lay in
Sector II, which encompassed approximately 800 acres. Because the use of Weatherford's property
needed to be addressed before a development plan for Sector II was designed, the City hired a neutral
third party to facilitate negotiations between Weatherford and his neighbors, and in November 1997,
Weatherford, the Director of the City's Planning and Zoning Commission ("the Commission"),
Commission staffers, urban planners, neighborhood residents, and several other participants attended
a "mediated design workshop." Those opposing any future development of Weatherford's property
were concerned that the development would create more traffic and change the character of the
neighborhood. The workshop resulted in a written agreement, the "Mediated Resolution,"
contemplating some future multi-family and commercial development of Weatherford's property. 

 In December 1997, the City adopted the "Sector II Plan" (the "Plan"), which
incorporated the Mediated Resolution. See City of San Marcos, Tex., Code of Ordinances No. 1997-74 (1997). The Plan stated several objectives, including the development of "a future land use map
for the area" and guidelines to ensure that development would be sensitive to existing uses, and the
strengthening of community relations "by fostering a partnership between the City and neighborhood
residents, property owners, institutions and businesses." Id. One part of the Plan was devoted
entirely to Weatherford's property, but all development was to proceed through the normal zoning
process and Weatherford was required to submit Planned Development District (PDD) zoning
applications before any development could begin. (2) Id.

 Over the next few years, Weatherford filed several PDD applications with the
Commission to develop his property pursuant to the Plan. The first PDD application was submitted
about twenty months after the Plan was enacted and requested the rezoning of 30.66 acres from
residential to commercial, multi-family, and duplex residential. The Commission's Assistant
Director of Planning recommended approval of the application, stating:


The requested land use acreages and densities were established as a result of the
mediated workshop settlement during the sector two planning process. . . . The
proposed PDD plan appears consistent with the land uses indicated in the mediated
settlement with one exception. The PDD plan indicates 3.8 acres of duplex
development. While [duplex development] is consistent with the 7 acres of 6-12
units per acre density allowance, duplex was not indicated as a future use on the
settlement plan.



 In September 1999, the Commission considered Weatherford's first PDD application. 
There was public opposition, and the Commission recommended denial of the application. (3) In
December 1999, the City Council heard arguments for and against Weatherford's application. 
Opponents voiced the same concerns raised at the workshop in 1997, that the development would
lead to substantial increases in traffic and an undesirable change in the character of the
neighborhood, and Weatherford's first PDD application was denied.

 In February 2000, Weatherford filed a standard, non-PDD application seeking the
rezoning of 18.6 acres (hereafter "first rezoning application"). After the Commission recommended
its denial, Weatherford requested to withdraw the application. The Commission honored his request
and the application was withdrawn. In July 2000, Weatherford filed a second PDD application, and
the Commission recommended approval. However, Weatherford, through conversations with City
officials, believed that his application would be denied and again sought to withdraw the application
in a letter dated August 25, 2000.

 In September 2000, Weatherford filed a second non-PDD application to rezone 18.6
acres (hereafter "second rezoning application"). In a letter dated November 7, 2000, addressed to
Mayor David Chiu and the City Council, Weatherford urged the adoption of his second rezoning
application. The next day, however, Weatherford sent Chiu and the Council another letter in which
he said he wanted to withdraw the previous day's letter. He also said, "I believe that the City should
honor what was agreed to and passed . . . in the Sector II Plan in connection with the 54 acres that
I own. I do not believe that I should have to accept anything less than what has already been
approved." He asked that his second rezoning application be "removed from the November 13,
2000, agenda and that the City not vote on the land use proposal at this time."

 The City removed Weatherford's second rezoning application from the November
13 agenda but then placed it on the December 11, 2000 agenda. Weatherford wrote a letter to Chiu,
stating, "My letter, dated November 8, 2000, established quite clearly that my November 7, 2000
request to have the amended land use proposal regarding eighteen acres of my property adopted was
withdrawn in all respects." He asked that his second PDD application, which he requested to be
withdrawn in August 2000, be placed on the agenda in place of his second rezoning application. He
closed the letter with the statement that if the City Council considered his second zoning application
and not his second PDD application, he would "consider all remedies available to me."

 Weatherford's second rezoning application remained on the agenda for the December
11, 2000 City Council meeting, but when it came up for discussion, the Council unanimously voted
to table it. The Council then adjourned and went into executive session "pursuant to the Government
Code, Section 551.071, to seek the City Attorney's advice regarding the Weatherford future land use
plan amendment." (4) When the City Council reconvened a few minutes later, Mayor Chiu made this
statement:


This Friday, December 15, 2000, will be the third anniversary of the City Council's
adoption of the Sector 2 Plan. The City Charter provides for the Planning and
Zoning Commission to hold public hearings and make recommendations to the City
Council regarding the land use element of the master plan once every three years. 
The City Council would like for the process for review of the land use element of the
Sector 2 Plan to be undertaken and completed as soon as possible by the Planning
and Zoning Commission, with involvement of all Sector Two Stakeholders. The
Commission may wish to consider any changed circumstances it finds within Sector
2 itself, and in nearby areas of other sectors, in making its recommendations. In light
of this direction to the Planning and Zoning Commission, the Council wishes to
withhold final action on [Weatherford's] pending land use amendment, LUA-00-03,
and table the amendment until the recommendations of the Planning and Zoning
Commission are received.



The City Council then tabled consideration of Weatherford's second rezoning application.

 Weatherford filed a third PDD application "under protest" in early 2001. This
application was intended to duplicate his second PDD application that the Commission had approved
but Weatherford withdrew before City Council consideration. The Commission at the time was
composed of only eight members due to the recent resignation of its chairman, and its vote on the
third PDD application ended in a four-to-four tie. At the urging of the City Attorney, the
Commission placed the third PDD application on its agenda for the next meeting. The City Attorney
also advised the outgoing chairman that he could participate in Commission meetings and vote
because the chairman retained de facto authority pending the appointment of his replacement. The
Commission tabled consideration of Weatherford's application by a six-to-three vote.

 On July 23, 2001, the City Council passed a revised Sector II Plan (the "Revised
Plan"). The Revised Plan reduced the acreage Weatherford could develop as multi-family residential
and enlarged the acreage he could devote to single-family residential. The Council then denied
Weatherford's third PDD application, drafted pursuant to the original Sector II Plan.

 Weatherford sued the City for declaratory and injunctive relief. He complained that:
(1) the City's treatment of his various applications violated his rights to equal protection and due
process; (2) the City and the individual defendants violated the Open Meetings Act (5) ("the Act") by
going into executive session on December 11, 2000; (3) it was improper for a resigning Commission
member to have voted on his third PDD application; (6) (4) the City should be estopped from denying
his applications because the City acted in a proprietary, not governmental, capacity in passing the
original and revised Sector II plans; (5) he was entitled to have his applications approved because
they were actually "permits" under chapter 245 of the government code; and (6) the City's failure
to approve his applications constituted a regulatory taking. 

 The City filed three motions for summary judgment. The first was a traditional
motion for partial summary judgment on Weatherford's claims of violations of the Open Meetings
Act. See Tex. R. Civ. P. 166a(c). The second was a no-evidence motion for partial summary
judgment on Weatherford's claims of the equal protection and due process violations. See id.
166a(i). The third was a traditional motion, contesting all issues raised by Weatherford. The City
contended that Weatherford's equal protection and due process rights had not been violated because
the City's treatment of his applications was reasonable. It also challenged Weatherford's standing
to sue under the Act and argued that there was no violation of the Act. The City further argued that
Weatherford had no absolute right to withdraw his second rezoning application, the City's actions
were not subject to estoppel, Weatherford's applications were not permits that must be approved,
there was no regulatory taking, and the individual council members were entitled to governmental
immunity. The trial court granted summary judgment without specifying the grounds.

 On appeal, Weatherford argues that: (1) the City's denials of his PDD applications
were arbitrary, capricious, and unreasonable; (2) the City violated his equal-protection rights by
allowing him to withdraw his first rezoning application, refusing to consider his second PDD
application on grounds that he had withdrawn it, and then considering his second rezoning
application in spite of his requests that it be withdrawn; (3) the City violated the Act in its December
11, 2000 meeting; (4) the passage of the sector plans was a proprietary function and, therefore, the
City is not entitled to governmental immunity; (5) the City violated chapter 245 of the local
government code; (6) the denial of his PDD applications constituted an unconstitutional regulatory
taking; (7) the City should be enjoined from violating the Act and from considering Weatherford's
PDD applications under the Revised Plan; and (8) the individual council members were not entitled
to immunity. 


Standard of Review


 The City filed both traditional and no-evidence summary judgment motions. See Tex.
R. Civ. P. 166a(c), (i). We make inferences, resolve doubts, and view the evidence in the light most
favorable to the nonmovant. Rhone-Poulenc, Inc. v. Steel, 997 S.W.2d 217, 222 (Tex. 1999). When
an order granting summary judgment does not specify the grounds on which it was granted, we will
affirm the judgment if any of the movant's theories are supported by the evidence. Carr v. Brasher,
776 S.W.2d 567, 569 (Tex. 1989). 

 A party moving for a traditional summary judgment bears the burden of establishing
that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. 
Steel, 997 S.W.2d at 222. A defendant seeking summary judgment must negate at least one essential
element of plaintiff's theory or establish every element of an affirmative defense. Id. at 223; Lear
Siegler, Inc. v. Perez, 819 S.W.2d 470, 471 (Tex. 1991). 

 A no-evidence summary judgment is essentially a directed verdict granted before trial,
and a no-evidence motion asserts that no evidence exists as to at least one essential element of the
nonmovant's claims on which the nonmovant would have the burden of proof at trial. Jackson v.
Fiesta Mart, 979 S.W.2d 68, 70-71 (Tex. App.--Austin 1998, no pet.). A no-evidence motion for
summary judgment is properly granted if the nonmovant fails to respond with more than a scintilla
of probative evidence raising a genuine issue of material fact. Id. If the proffered evidence would
enable reasonable, fair-minded persons to differ in their conclusions, more than a scintilla of
evidence exists. Id. at 71. If the evidence does no more than "'create a mere surmise or suspicion'
of fact," less than a scintilla of evidence exists. Id.


Analysis


Equal Protection and Due Process Claims

 Weatherford argues that his equal protection rights were violated and his fundamental
property rights infringed when the City allowed him to withdraw his first rezoning application and
second PDD application but denied a similar request to withdraw his second rezoning application. 
He also argues that his fundamental property rights were harmed when the City Attorney advised the
Commission that it could reconsider Weatherford's third PDD application after the first vote ended
in a tie. Weatherford contends that the City had to show that its disparate treatment of the
applications was "narrowly tailored to serve a compelling governmental interest." 

 Weatherford has not pleaded a true equal protection claim. An equal protection claim
"requires that the government treat the claimant different from other similarly-situated landowners." 
Mayhew v. Town of Sunnyvale, 964 S.W.2d 922, 939 (Tex. 1998). Weatherford does not claim that
he was treated any differently than any other City landowner, but only that he himself was treated
differently at different times during his application process. See id. Moreover, Weatherford had no
vested property right in any particular zoning classification. See City of Univ. Park v. Benners, 485
S.W.2d 773, 778 (Tex. 1972); City of San Antonio v. Arden Encino Partners, Ltd., 103 S.W.3d 627,
630 (Tex. App.--San Antonio 2003, no pet.); Williamson Pointe Venture v. City of Austin, 912
S.W.2d 340, 343 (Tex. App.--Austin 1995, no writ).

 The PDD application process did not vest any property rights in Weatherford because
the PDD approval process remained a legislative act subject to the discretion of the City. The results
of the workshop were incorporated into the Sector II Plan, which was to serve as a guide for future
development. See City of San Marcos, Tex., Code of Ordinances No. 1997-74 (1997). It did not
rezone any property but instead set out a list of permitted uses. See id. The Plan expressly stated
that applicants still had to go through the zoning process for approval: "All uses permitted in the
table shown above shall be implemented through the submittal of one or more Planned Development
District (PDD) zoning cases." Id. Weatherford's PDD applications were in essence rezoning
applications and were subject to the legislative process used by the City in reviewing any other
rezoning request. See City of Pharr v. Tippitt, 616 S.W.2d 173, 175-76 (Tex. 1981); see also John
Mixon, James L. Dougherty, Jr. & Brenda N. McDonald, Texas Municipal Zoning Law, § 7.104 (3d.
ed. 1999) ("[a]doption or rejection of a PDD by ordinance amendment is, by current Texas and Fifth
Circuit law, a legislative act"). Zoning is a governmental function that allows "a municipality, in
the exercise of its legislative discretion, to restrict the use of private property." City of Brookside
Village v. Comeau, 633 S.W.2d 790, 792 (Tex. 1982); see Mayhew, 964 S.W.2d at 933 ("Zoning
decisions are vested in the discretion of municipal authorities; courts should not assume the role of
a super zoning board."); City of Round Rock v. Smith, 687 S.W.2d 300, 302-03 (Tex. 1984) ("plat
approval is a governmental function").

 Weatherford further argues that the City's decisions to deny his applications were
"arbitrary, capricious and unreasonable" and did not bear a substantial relationship to public health,
safety, morals, or general welfare. He claims that the City's denials of his applications were arbitrary
and capricious because his applications complied with the land uses and densities agreed to during
the workshop in 1997. He also argues that there is no evidence that the City cited concerns for the
public health, safety, morals, or general welfare in denying his applications. 

 To comply with substantive due process, zoning decisions need only be "rationally
related to legitimate government interests." Mayhew, 964 S.W.2d at 938. We "should not set aside
a zoning determination for a substantive due process violation unless the action 'has no foundation
in reason and is a mere arbitrary or irrational exercise of power having no substantial relation to the
public health, the public morals, the public safety or the public welfare.'" Id. at 938 (quoting Nectow
v City of Cambridge, 277 U.S. 183, 187-88 (1928)). As the nonmovant in a no-evidence motion for
summary judgment, Weatherford had the burden of overcoming the presumption of validity of the
City's conduct in the exercise of its legislative authority and proving the City's conduct was
unreasonable. City of Pharr, 616 S.W.2d at 176. If reasonable minds could differ as to whether the
City's zoning action had a substantial relationship to the public health, safety, morals or general
welfare, the action must stand as a valid exercise of the City's police power. See Mayhew, 964
S.W.2d at 938; City of Waxahachie v. Watkins, 275 S.W.2d 477, 481 (Tex. 1955).

 The minutes from the various City Council meetings show extensive discussions
about the effects of urbanization on the surrounding neighborhood. Weatherford claims that the City
Council did not cite the ill effects of urbanization as reasons for denying his applications, but the
record indicates that such opposition to Weatherford's development was expressed each time his
applications were considered. For example, the minutes of the December 13, 1999 meeting show
that Weatherford's neighbors voiced their concerns about increased traffic, increased pollution,
changing the character of the neighborhood, urban sprawl, drainage problems, utilities problems, and
changes in their quality of life for those in the affected area. It is apparent that the basis for the City
Council's action was the significant public opposition to Weatherford's requested development. In
short, the City's decisions to deny Weatherford's PDD applications were rationally related to the
general welfare; namely, protecting residents from the negative impact of urbanization and
maintaining quality of life. See Mayhew, 964 S.W.2d at 938-39. We conclude that Weatherford
presented no evidence that the City acted in an arbitrary and capricious manner when it rejected
Weatherford's rezoning applications. 

 Weatherford also argues that the City's refusal to withdraw his application to rezone
was arbitrary and capricious and that the City acted in an arbitrary and capricious manner in allowing
the city attorney to place Weatherford's third PDD application back on the Commission's agenda
after the first vote ended in a four-to-four tie. Once the application was placed back on the agenda
and nine members were allowed to vote, the Commission voted to table the application pending
changes to the Plan. Weatherford argues that as a result he was denied the opportunity to have his
application evaluated under the original Plan.

 At best, Weatherford's complaint is that the procedure used by the City was unfair. 
However, "this is not the proper inquiry." Id. at 939. "Zoning is a legislative act," and in making
zoning determinations, a municipality "is entitled to consider all the facts and circumstances which
may affect the property, the community, and the welfare of its citizens." Id. at 939-40. To satisfy
procedural due process, the City need "only provide notice and an opportunity to be heard." Id. at
939. Weatherford had both notice and an opportunity to be heard and had no right to have any of
his applications approved--whether under the original Sector II Plan or the Revised Plan. We
overrule Weatherford's first and second issues.


Violations of Open Meetings Act and Injunctive Relief

 Weatherford alleged that the City Council violated the Open Meetings Act when it
went into executive session during the City's regular council session on December 11, 2000. See
Tex. Gov't Code Ann. §§ 551.001-.146 (West 2004) (the "Open Meetings Act," hereafter "the Act"). 
The record indicates that Mayor Chiu was "advised" to go into executive session pursuant to section
551.071 of the government code, which allows a governmental body to convene a closed session to
seek its attorney's advice about "pending or contemplated litigation." See id. § 551.071. 
Weatherford argues that this announcement was at odds with the meeting's notice, which stated that
"the City Council may adjourn into Executive Session to consider any item listed on this agenda if
a matter is raised that is appropriate for the Executive Session discussion." (Emphasis added.) He
contends that there was no "pending or threatened" litigation and, even assuming there was, the
matter was never "raised" during the course of the open meeting. 

 Generally, meetings of governmental bodies must be open to the public. See id.
§ 551.002. "Actions" taken in violation of the Act are voidable. Id. § 551.141. A governmental
body, however, may meet with its attorney in private to discuss "pending or contemplated litigation." 
Id. § 551.071. Before closing a meeting, the presiding officer must publicly announce an intent to
go into a closed meeting and identify the statutory basis for doing so. Id. § 551.101. The Act does
not prohibit the expression of opinions in a closed session, as long as the actual vote or decision is
made in an open session. Thompson v. City of Austin, 979 S.W.2d 676, 685 (Tex. App.--Austin
1998, no pet.).

 The Act also requires advanced written notice of all meetings held by a governmental
body. Tex. Gov't Code Ann. § 551.041. The notice requirements also apply to executive sessions,
and the notice must be sufficiently specific to alert the general public to the topics to be considered. 
Cox Enters., Inc. v. Board of Trustees, 706 S.W.2d 956, 958 (Tex. 1986). "As long as a reader is
alerted to the topic for consideration, it is not necessary to state all of the consequences which may
flow from consideration of the topic." Id. The notice provision is intended to provide public access
to and increase public knowledge of government decisionmaking. City of San Antonio v. Fourth
Court of Appeals, 820 S.W.2d 762, 765 (Tex. 1991). "The Open Meetings Act is not a legislative
scheme for service of process; it has no due process implications. Rather, its purpose is to provide
'openness at every stage of'" governmental deliberations. Id. (quoting Acker v. Texas Water
Comm'n, 790 S.W.2d 299, 300 (Tex. 1990)). In reviewing a notice under the Act, we should ensure
that those purposes are served, but the notice need not be "tailored to reach those specific individuals
whose private interests are most likely to be affected by the proposed government action. . . . If a
'reader' is given notice, the requirement of the Act is satisfied and its purpose served." Id. If the
contents of a notice are undisputed, its adequacy is a question of law. City of San Angelo v. Texas
Natural Res. Conservation Comm'n, 92 S.W.3d 624, 629 (Tex. App.--Austin 2002, no pet.).

 The notice at issue stated that the Council intended to: 

 9. Remove from table and consider adoption of Resolution amending the Future
Land Use Plan of the City Master Plan from Mixed Use to Medium Density
Residential for an 8.13 acre, more or less, tract of property, and from Mixed Use
to Commercial for a 9.9 acre, more or less, tract of property, both tracts being
located near the intersection of Ranch Road 12 and Bishop Street
(Weatherford).[ (7)] 


25. . . . NOTE: The City Council may adjourn into Executive Session to consider
any item listed on this agenda if a matter is raised that is appropriate for
Executive Session discussion. An announcement will be made of the basis for
the Executive Session discussion. The City Council may also publicly discuss
an item listed on the agenda for Executive Session. 



 We note initially that the published notice was sufficient to comply with the Act. See
Tex. Gov't Code Ann. § 551.041; Cox Enters., 706 S.W.2d at 958. Further, Chiu's pronouncement,
made prior to the City's Council's closed meeting, on its face satisfied the requirements of the Act. 
See Tex. Gov't Code Ann. § 551.101. However, even if we assume that the City Council violated
the Act's closed session and notice provisions, we must still decide whether the City took any
"action" that would be voidable. Weatherford complains of the City Council's refusal to allow him
to withdraw his second rezoning application. We note, however, that before going into closed
session, the City Council voted to table Weatherford's application. Once the Council readjourned
after the closed session, it again voted to "withhold final action on the [Weatherford's] pending land
use amendment." 

 Weatherford's Open Meetings complaint fails in several ways. First, the City Council
voted to table the approval of Weatherford's second rezoning application before it went into closed
session and then simply voted again to table the application after the closed session. Further, the
action taken by the City Council before and after the closed session was essentially the action
Weatherford requested; namely, that the Council not consider his second rezoning application. 
Finally, even if opinions were expressed by the Council members in the closed session, such
expression is not prohibited, as long as the final decision or vote was made in an open session. See
Thompson, 979 S.W.2d at 685; see also Tex. Gov't Code Ann. § 551.102. Therefore, there is no
evidence that the City Council took some "final action" that would be voidable under the Act.

 The City established that there was no violation of the Act, and we therefore overrule
Weatherford's third issue. We also overrule his seventh issue, seeking an injunction to prohibit the
City from violating the Act in the future.


Proprietary versus Governmental Capacity

 Weatherford next argues that the City acted in a proprietary capacity and not its
governmental capacity when it (1) participated in the workshop in 1997, (2) evaluated his
applications to develop his property, and (3) enacted the sector plans. As discussed above, the City
acted in its governmental capacity in reviewing and evaluating Weatherford's applications. See City
of Round Rock, 687 S.W.2d at 302-03; City of Brookside Village, 633 S.W.2d at 792; see also Tex.
Civ. Prac. & Rem. Code Ann. § 101.0215(29) (West Supp. 2004) (classifying zoning and planning
as governmental functions for purposes of Tort Claims Act); Truong v. City of Houston, 99 S.W.3d
204, 210 (Tex. App.--Houston [1st Dist.] 2002, no pet.) (zoning and land-use ordinances and
enforcement of ordinances are governmental functions). As a general rule, governmental bodies are
not subject to estoppel in the exercise of their governmental capacity. City of Austin v. Garza, 124
S.W.3d 867, 874 (Tex. App.--Austin 2003, no pet.); Dillard v. Austin Indep. Sch. Dist., 806 S.W.2d
589, 594 (Tex. App.--Austin 1991, writ denied).

 We turn, then, to Weatherford's alternative argument--that governmental bodies are
subject to estoppel "where justice requires its application." See City of Hutchins v. Prasifka, 450
S.W.2d 829, 836 (Tex. 1970). He asserts that he relied on the "conduct and statements of some of
the individual defendants, prior city council members and employees of the City in connection with
the decision to participate in" the workshop and, after participating in the workshop, spent
substantial sums of money on the PDD application process, including time and money spent in filing
the applications and then amending them at the City's direction. Consequently, he argues, the City
should be estopped from denying or rejecting his PDD applications to the extent they comply with
the land uses and densities agreed upon during the workshop. Weatherford argues in the alternative
that if he was not entitled to the approval of his PDD applications, he should "recover economic
damages incurred in connection with his detrimental reliance."

 Weatherford's circumstances do not clearly demand application of the exception "to
prevent manifest injustice" as Texas courts have applied it. See Prasifka, 450 S.W.2d at 836 (under
exception, estoppel may be applied if "there is no interference with the exercise of [the
municipality's] governmental functions," and only in exceptional cases where circumstances clearly
demand it). Although Weatherford might say he received the "run-around" at various levels of the
City's zoning and land-use regulatory process, he cannot, on this basis, bind the City Council in its
exercise of ultimate legislative authority over planning and zoning decisions. See City of Round
Rock, 687 S.W.2d at 302-03; City of Pharr, 616 S.W.2d at 175; City of Farmers Branch v. Hawnco,
Inc., 435 S.W.2d 288, 291-92 (Tex. Civ. App.--Dallas 1968, writ ref'd n.r.e.) (statements by
individual council members are not binding on governmental body that can only act in governmental
capacity); see also Sheffield Dev. Co. v. City of Glenn Heights, 140 S.W.3d 660, 678 (Tex. 2004)
(actions or statements by individual city employees or officials were not considered to have been by
the city itself and held not to bind city). We conclude that the City acted in its legislative and
governmental capacity and that estoppel is not warranted by any threat of manifest injustice. We
overrule Weatherford's fourth issue.

 We further note that the individual City Council members are entitled to legislative
immunity to the extent they were acting in their legislative capacity. See In re Perry, 60 S.W.3d 857,
859-60 (Tex. 2001). Having concluded that the City was acting in its legislative capacity at the time,
we conclude that the individual defendants were entitled to governmental immunity and we overrule
Weatherford's eighth issue. See id.


Chapter 245 of the Local Government Code

 Appellant sought a declaration that his PDD applications, the first filed August 26,
1999, the second July 3, 2000, and the third in December 2000, are "permits" as defined by the local
government code. See Tex. Loc. Gov't Code Ann. § 245.001(1) (West Supp. 2004-05). He argues
on appeal that the City violated chapter 245 of the local government code when it tabled his third
PDD application until after the Sector Plan was revised and then denied the application for failure
to comply with the Revised Plan.

 We discussed whether an application to rezone property is a "permit" within the
definition of chapter 481 of the government code, the predecessor of chapter 245, in Williamson
Pointe Venture, in which we held that rezoning was not a "permit" as defined by statute. See 912
S.W.2d at 343 (citing Act of May 24, 1995, 74th Leg., R.S., ch. 794, § 1, 1995 Tex. Gen. Laws 4147,
4147-48 (codified at Tex. Gov't Code §§ 481.141-.143), "inadvertently" repealed by Act of June 1,
1997, 75th Leg., R.S., ch. 1041, § 51(b), 1997 Tex. Gen. Laws 3943, 3966, reenacted by Act of April
29, 1999, 76th Leg., R.S., ch. 73, §§ 1, 2 1999 Tex. Gen. Laws 431, 432, and recodified at Tex. Loc.
Gov't Code Ann. §§ 245.001-.006 (West Supp. 2004-05)). (8)

 A "permit" is a "license, certificate, approval, registration, consent, permit, or other
form of authorization required by law, rule, regulation, or ordinance that a person must obtain to
perform an action or initiate, continue, or complete a project for which the permit is sought." Tex.
Loc. Gov't Code Ann. § 245.001(1); see Williamson Pointe Venture, 912 S.W.2d at 343 (quoting
Tex. Gov't Code § 481.142(2)). An application to rezone is not a request for an "approval" or for
some "other form of authorization required by law," and "[t]he proposition that the legislative act
of zoning entitles the landowner to develop his or her property free from all subsequent regulatory
changes is so contrary to established law that the legislature, had it wanted to effect such a change,
must have clearly so stated." Williamson Pointe Venture, 912 S.W.2d at 343. An application to
rezone property is not the first of a series of required permits but rather a preliminary step in seeking
to develop property. Id. A municipality may rezone property "to entirely prohibit previously
permissible uses, even established uses," and thus can amend regulations or, in this case, master
plans, in ways that "affect the prospective development of the property within the broad zoning
categories." Id. (9)

 Because Weatherford's applications do not come within the definition of "permit,"
we overrule his fifth issue.


Regulatory Taking

 Weatherford argues that the City's denials of his applications constituted a regulatory
taking because they unreasonably interfered with his right to use and enjoy his property, (10) were
arbitrary, capricious and unreasonable, and did not advance any legitimate government interest. 
Weatherford argues that the City's zoning ordinances fail to advance any legitimate government
interests only as they were applied to his situation. In its motion for summary judgment, the City
argued that the denials of Weatherford's applications did not devalue his property and that the City's
decisions substantially advanced its legitimate governmental interests.

 The Fifth Amendment of the United States Constitution and article I, section 17 of
the Texas Constitution prohibit the government from taking private property for public use without
adequate compensation. Mayhew, 964 S.W.2d at 933. A regulatory taking may occur if a land-use
regulation unreasonably interferes with a landowner's right to use and enjoy his property or does not
substantially advance a legitimate governmental interest. Id. at 934-35. (11)


Substantial advancement


 Municipal bodies have discretion to make zoning decisions as long as they comply
with constitutional limitations. Id. at 933. To satisfy constitutional considerations, a zoning decision
or other property regulation must substantially advance a legitimate governmental interest. Id. In
reviewing a zoning decision, the inquiry is not whether the decision was wise, but whether it
substantially advanced some legitimate state interest. Id. at 934. A municipality's concern with the
"ill effects of urbanization" may justify its action under a takings analysis. Id. at 935. The City,
along with Weatherford's neighbors, was concerned that commercial development would increase
congestion and pollution, change the character of the neighborhood, and negatively affect the overall
quality of life for Weatherford's neighbors. Weatherford hoped to add hundreds of living units,
many in the form of duplexes, apartments, and townhomes, and to construct a commercial
infrastructure. There is no disputing that his proposals could have drastically changed the character
of the neighborhood. We therefore conclude that the City showed that its denials of Weatherford's
applications substantially advanced a legitimate governmental interest. See id. at 935 (proposed
development would add 3,600 housing units to rural area with only 2,000 current residents, resulting
in population increase of more than 10,000 people; zoning decision held to substantially advance
municipality's legitimate interests in "preserving the rate and character of community growth").


Unreasonable interference with use and enjoyment


 The City's denials of Weatherford's applications could also constitute a taking if they
unreasonably interfered with Weatherford's use and enjoyment of his property. See id. Determining
whether the City unreasonably interfered with the use and enjoyment of Weatherford's property
requires a consideration of two factors: (i) the economic impact of the City's decision and (ii) the
degree to which the decision interferes with investment-backed expectations. Id.

 Consideration of the economic impact of the regulation requires a comparison of the
value taken from the property with the property's remaining value. Id. at 935-36. "The loss of
anticipated gains or potential future profits is not usually considered in analyzing this factor." Id. 
The second factor is landowner's investment-backed expectation. Id. The property's current
permitted uses constitute the landowner's "primary expectation" that may be affected by regulation. 
Id. (quoting Penn Cent. Transp. v. City of New York, 438 U.S. 104, 136 (1978)). "Knowledge of
existing zoning is to be considered in determining whether the regulation interferes with
investment-backed expectations," and historical uses of the property are of critical importance in
determining the landowner's reasonable investment expectations. Id. at 936-37. Whether a decision
so unreasonably restricts a landowner's property rights as to amount to a taking is a question of law,
but we rely on the trial court to "resolve disputed facts regarding the extent of the governmental
intrusion." Id. at 936.

 The City noted, and Weatherford has not attempted to prove otherwise, that the Sector
II Plan had no effect on the value of Weatherford's property or in the property's underlying zoning
designation. At best, Weatherford's argument is that his property would be worth more if he could
rezone it. The loss of future profits is not usually considered in our analysis. Id.

 Further, Weatherford had no "investment-backed expectations" to develop the
property when he purchased it. In his affidavit, Weatherford stated, "Although I did not intend to
develop the property at the time I purchased it during the 1960s, I did begin to entertain ideas during
the 1990s about selling my property for someone else to develop after I started getting inquiries from
real estate professionals." The property has been zoned for single-family residences since the 1970s,
and Weatherford bought most of his land in 1961 not for investment purposes but for his personal
use to build his home. Weatherford admitted that his investment expectations formed well after the
property was zoned single-family residential.

 We conclude that the City demonstrated that its decisions did not unreasonably
interfere with the use and enjoyment of his property and substantially advanced legitimate
governmental interests. See id. at 938 (landowners bought first tract to use for ranching when no
zoning was yet in place and later, after zoning was in place, bought other tracts with development
in mind; court held that they lacked reasonable expectation to pursue development under existing
state of community and zoning regulations); see also Sheffield, 140 S.W.3d at 676-78 (after
developer bought land, city rezoned to allow fewer homes per square feet, thus devaluing expected
investment return; despite evidence that city "attempted to take unfair advantage of" developer,
rezoning did not amount to taking). Further, as discussed above, we conclude that the City
established that it did not act in an unreasonable, arbitrary, or capricious manner in making its
determinations. Instead, the City took into account the considerable opposition to Weatherford's
applications and determined that the interests of the public would be best served by denying his
applications. Weatherford has not produced evidence to the contrary. We overrule Weatherford's
sixth issue.


Conclusion


 Having overruled Weatherford's issues on appeal, we hold that the district court did
not err in granting summary judgment for the City. We affirm the district court's summary judgment.



 __________________________________________

 David Puryear, Justice

Before Justices Kidd, Puryear and Pemberton

Affirmed

Filed: December 9, 2004

1. The purpose of a comprehensive land-use plan is to provide for the "long-range
development of the municipality" and may be "used to coordinate and guide the establishment of
development regulations." Tex. Loc. Gov't Code Ann. § 213.002 (West Supp. 2004-05).
2. The Plan does not define "Planned Development District," and there is nothing in the
record to show whether the phrase was defined at the time the Plan was enacted. We note generally,
however, that cities use planned development districts as an alternative to traditional zoning:


 PDD procedures allow developers to obtain site-specific approval for
developments that may not fit standard area and use zoning categories and that
require specific negotiation to ensure that community interests are protected. 
PDDs conventionally accommodate designated types of major development, such
as apartment projects, cluster housing, office developments, shopping centers,
and hospital facilities.


John Mixon, James L. Dougherty, Jr. & Brenda N. McDonald, Texas Municipal Zoning Law, § 7.100
(3d ed. 1999).
3. The Commission's role is to hold public hearings and make a final report to the governing
municipal body. See Tex. Loc. Gov't Code Ann. § 211.007(b) (West 1999). The governing body
can require that it may only overrule the Commission's negative recommendation by a vote of three-fourths of the governing body's members. See id. § 211.006 (West 1999). 
4. Section 551.071 allows a governmental body to "conduct a private consultation with its
attorney" when seeking advice about "pending or contemplated litigation." Tex. Gov't Code Ann.
§ 551.071 (West 2004).
5. Tex. Gov't Code Ann. §§ 551.001-.146 (West 2004),
6. Weatherford does not raise this issue on appeal.
7. This was Weatherford's second rezoning application. 
8. Weatherford asserts that the case law cited by the City, which is based on chapter 481, is
not applicable. Chapter 245 was enacted in 1999 because its predecessor, chapter 481, was
"inadvertently" repealed in 1997. See Act of April 29, 1999, 76th Leg., R.S., ch. 73, § 1, 1999 Tex.
Gen. Laws 431, 432. The relevant portions of chapter 245 are largely identical to their predecessor
statutes in chapter 481, and thus, cases discussing chapter 481 are still valid. Compare Act of May
24, 1995, 74th Leg., R.S., ch. 794, § 1, 1995 Tex. Gen. Laws 4147, 4147-48 (amending Tex. Gov't
Code §§ 481.142 (Definitions), .143 (Uniformity of Requirements)), with Tex. Loc. Gov't Code
Ann. §§ 245.001 (Definitions), .002 (Uniformity of Requirements).
9. Although we noted in Williamson Pointe Venture v. City of Austin that 1995 amendments
provided that "preliminary plans and related subdivision plats, site plans, and all other development
permits for land covered by such preliminary plans of subdivision plats are considered collectively
to be one series of permits," we considered the statute as it read before the amendments and did not
decide whether zoning constituted a permit under the amended statute. 912 S.W.2d 340, 345 n.7
(Tex. App.--Austin 1995, no writ). However, the definition of permit was not amended in 1995,
and the definition currently enacted is virtually identical to the definition considered by the court in
Williamson Pointe Venture. The 1995 amendments did not change the fact that zoning and rezoning
are legislative acts. See City of Pharr v. Tippitt, 616 S.W.2d 173, 176 (Tex. 1981). As we stated,
"[r]ezoning is a step that must be taken before a preliminary plan or subdivision plat can be filed,"
and a City's decision to "process an application for subdivision only after the property is properly
zoned does not make zoning a 'permit.'" Williamson Venture Pointe, 912 S.W.2d at 343.
10. Weatherford cites City of Glenn Heights v. Sheffield Development Co., 61 S.W.2d 634
(Tex. App.--Waco 2001), in support of his contention that the City unreasonably interfered with his
right to use and enjoy his property. However, that case was recently reversed by the supreme court. 
See 140 S.W.3d 660 (Tex. 2004).
11. A taking may also occur if a zoning decision denies a landowner "all economically viable
use of their property," Mayhew v. Town of Sunnyvale, 964 S.W.2d 922, 935 (Tex. 1998), but
Weatherford does not allege that the City's decision has such an impact on the use of his property. 
See also Sheffield, 140 S.W.3d at 670-72 (suggesting that regulatory takings might be found in
situations other than physical effect short of governmental possession, denial of all economically
beneficial use, or failure to substantially advance legitimate state interests).